Filed 7/24/15  In re J.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062514 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ014621) |
| v. | OPINION |
| D.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Lawrence P. Best, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant D.S.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

1

Gregory P. Priamos, County Counsel, Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

Defendants and appellants J.S. (father) and D.S. (mother) appeal from the juvenile court's finding of a substantial risk of detriment to their children's emotional well-being under Welfare and Institutions Code[1] section 366.21, subdivision (f), and from the court's order maintaining foster placement and ordering continued reunification services to father.  Because the record reveals substantial evidence to support the court's finding, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns whether the dependent minors in this case, seven-year-old twin boys, J.S. and B.S., can safely be returned to their father, who they have not seen in two years, without creating a substantial risk of harm to their emotional well-being.  Over their short lives, the twins have been the subject of three dependency petitions.  In 2009, they were removed from the custody of mother, who lives in California, and placed with father, who had been deported to Mexico.  From 2009 to 2012, the twins lived with father in Mexico.

This matter is before us now because father allowed mother to take the twins back to California, where she lived with them for nearly a year until she attempted suicide by overdosing on alcohol and pills in August 2013.  For the past year, the twins have lived in a foster home with their older half-brother, J.M., mother's biological son whom the

---

[1] All further statutory references are to the Welfare and Institutions Code.

twins' foster parents adopted.  During this time, the twins have had no visits with father and only a handful of brief phone conversations, as the twins can no longer speak Spanish and father cannot speak English.

1.    *The prior dependency petitions*

The twins first came to the attention of the Riverside County Department of Public Social Services (DPSS) in June 2008 when they were 11 months old.  Mother and father were living in Indio at the time, and mother was arrested for public intoxication and child endangerment.  Mother had an extensive history with child protective services (she herself was once a dependent of the court) and was on probation for drug possession and burglary.  DPSS filed a dependency petition but the court ultimately dismissed it at DPSS's request.

In December 2008, father was deported to Mexico.  The circumstances of his deportation are not clear from the record.  In interviews with DPSS and DIF (Mexico's social services agency), father said he was deported after he contacted police to report mother's neglect of the twins; immigration became involved because he was living with mother "illegally."  However, a DPSS report states that in December 2008 the police were investigating mother's battery and domestic violence allegations against father.[2]  At the contested 12-month hearing, mother testified that the dispute was a verbal one.

---

[2]  In a detention report filed on February 17, 2009, the social worker stated that an officer gave her a police report of an incident on December 23, 2008, in which mother had been the "victim of battery and domestic violence by [father]."

A few months after father's deportation, mother was arrested for child endangerment, violating her probation, and obstructing a police officer. DPSS took the twins and two of mother's other children into protective custody. One of these children was the twins' older half-brother, J.M., who was subsequently adopted by the same foster couple who are currently caring for the twins. DPSS filed a section 300 petition (the second as to the twins) alleging, among other things, that mother's physical abuse of the twins and their two half-siblings, and her abuse of methamphetamine and alcohol placed the children at a substantial risk of serious physical or emotional harm..

Pursuant to the juvenile court's disposition order, the twins were placed with father in Mexico on August 31, 2009. A month later, the juvenile court awarded sole legal and physical custody of the twins to father, and terminated the dependency proceeding. At some point after the court's order, mother went to Mexico to live with father and the twins. Mother and father's youngest child, M.M., was also living with them in Mexico.[3] The family lived together until January 2013, when father allowed mother to take the twins back to the United States.

2. *The current dependency petition*

In August 2013, mother attempted suicide by overdosing on alcohol and pills. She was taken to the hospital after B.S. found her unresponsive in their home. A DPSS social worker spoke with mother; the twins had been living with her in Desert Hot Springs.

---

[3] M.M., who was five years old at the time of the contested 12-month hearing, still lives in Mexico with father.

Mother would not reveal where the twins were, and the social worker was unable to locate them to take them into protective custody.

After she was discharged from the hospital, mother called the social worker to inform her that she was in custody of the twins. She agreed to "hand the children" to DPSS, and asked that they be placed with father in Mexico. The social worker contacted father and, with the assistance of a translator, notified him of the upcoming detention hearing. He told the social worker that he wanted custody of the twins.

DPSS filed a third section 300 petition as to the twins, alleging they were at substantial risk of serious physical or emotional harm due to mother's mental health condition, attempted suicide, and extensive history with DPSS. The petition also alleged father failed to protect the twins by allowing mother to take them to the United States despite her history of substance abuse and child neglect.

During an interview with the social worker, the twins reported that they used to live in Mexico and that father had let mother take them to the United States. While living in Mexico, they had witnessed physical violence between their parents. J.S. said that he had tried to intervene at times to protect mother, but father would push him away, and B.S. said that father would continue to hit mother even when they tried to stop him.

The social worker also interviewed mother, who admitted that she and father had engaged in domestic violence when they were living in the United States and Mexico, and that the twins had witnessed some of these incidents. She reported that she had suffered injuries from being hit by father. She said that father had dragged her by her clothes and hair, restrained her with a rope, and kicked her with a steel toed boot, causing

a vein in her leg to rupture. Based on this new information, DPSS filed an amended 300 petition, adding the allegation that mother and father had engaged in domestic violence in the twins' presence.

Early on in their foster placement the twins had a phone call with father, but it did not last long. The twins walked away from the phone, saying that they did not speak Spanish. At that point, it was unclear to the social worker whether the twins had forgotten how to speak Spanish or were choosing not to.

At the jurisdiction and disposition hearing, the court found that the twins were dependents under section 300, subdivision (b), and ordered them removed from mother and father's custody. The court provided reunification services to father but denied them to mother. Father's case plan required him to participate in counseling and a parenting education program. The twins' counsel informed the court that the twins "do not want to visit [father] and are refusing to visit." The court ordered monthly visits with father at the United States/Mexico border, as well as a study of father's home, to be performed by DIF. The court stated that if there was an issue with the twins not wanting to visit father, DPSS could bring it to the court's attention at a later time.

        a.     *The twins' first year of out-of-home placement*

Sometime after the jurisdiction and disposition hearing, a different social worker began working on the twins' case. In December 2013, the twins were placed with a different foster couple, J.Y. and J.S., who were in the process of adopting the twins' older half-brother, J.M. Around that same time, mother remarried and moved to Twenty-nine Palms.

Before the six-month review hearing, the social worker filed a status report recommending that the twins remain with their foster parents. He stated that father had demonstrated a disregard of the juvenile court's and DPSS's previous concerns about mother by allowing her to live in his home as soon as the twins were placed in his care, and by allowing her to take the twins back to the United States. By the time of the six-month review hearing, father's home had been assessed and approved. The juvenile court ordered DPSS to provide an additional six months of reunification services to father, and it authorized in-home visits. Shortly after this hearing, the court granted the foster parents' motion for de facto parent status.

In the months leading up to the 12-month review hearing, father completed his reunification plan, which included a psychological evaluation, counseling, and a parenting program. The psychological evaluation described him as "emotionally stable, able to control impulses, and stable in the community." Additionally, DIF's home study had found that father had made plans for the twins' care during the hours he worked, and had arranged for their schooling and medical insurance coverage. However, not a single visit took place between father and the twins. The social worker cited father's job at the meatpacking plant as the reason for the scheduling difficulties.

In a status report prepared for the 12-month review hearing, the social worker recommended against returning the twins to father's custody based on "[father's] availability and challenges with making visits." The social worker stated that father "has only been available on the weekends, which doesn't work for the Department." He also stated that, due to the lack of visits, he had no way to assess father's relationship with the

7

twins. The twins had been living in the home of their foster parents for almost a year, and were physically and developmentally healthy and doing well in school. They had bonded to their foster parents and their half-brother. They had told the social worker that they were happy in their foster home and wanted to be adopted, and the foster parents were willing to adopt them. The social worker stated that it was not in the best interest of the twins "to be suddenly thrown into an environment where they don't know anyone, can't speak the language, no one is able to help them make the adjustment, and they are somehow expected to just make an adjustment without any assistance." He recommended that the juvenile court terminate father's reunification services and set a section 366.26 hearing to consider adoption.

The foster parents filed a caregiver information form stating that they had "religiously attempted to contact the father early on," but, due to language barriers, father was unable to communicate with the twins. Mother had offered to be a translator and the foster parents had given her their number to set up conference calls with father. Mother had set up such calls in the beginning, but ultimately did not follow through. During the year the twins had been in the foster parents' care, they received only one call from father. The twins returned father's call but, as of the time of filing, had been unable to reach him.

At the original 12-month review hearing the court set a contested 12-month hearing, at mother's request, for December 1, 2014. About a week later, the twins finally had a phone conversation with father; however, it lasted only about three minutes due to

8

the language barrier. He asked the twins how they were doing and told them he loved them.

DPSS filed an addendum report in which the social worker stated that DPSS had contacted the Mexican Consulate and set up a visit with father at the San Ysidro location on the United States/Mexico border for December 4, 2014. The social worker again expressed his concerns about returning the twins to father's custody. He stated that father had not demonstrated a bond with the twins and had not been contacting the foster parents despite having their phone number. Father was, however, in daily contact with mother, who had been denied services and with whom he had a history of domestic violence. The social worker also noted that father had asked DPSS about whether he would be able to "receive 'papers' " to allow father to be in the United States if the twins were placed with him. The social worker changed his recommendation from terminating reunification services to continuing services to father for another six months.

b. *The contested 12-month review hearing*

On December 1, 2014, the juvenile court held a contested 12-month review hearing and heard testimony from mother, one of the twins' foster parents (J.Y.), and the social worker. Mother testified that in January 2013 she took the twins with her to California after father "let [her] have them" for a "[c]ouple months." She said that father had been lying when he told DPSS that he had only allowed her to take the boys for one week. From the time she took the twins to California until they were removed from her care in September 2013, the twins did not see their father. They did, however, have phone contact with him every other day.

Mother testified that the twins had been bilingual when they were removed from her care, but that they can no longer speak Spanish. After the boys were placed in their current foster home, there were two occasions when she had called father and translated his conversations with the twins. Mother testified that when they had lived together in Mexico, father had been a good parent to the twins and the twins had bonded with him and their sister, M.S.

Mother testified that DPSS had attempted to contact father, but they would call during his work hours when he was unavailable. She also explained that father could not attend the December 4, 2014, visit that the Mexican Consulate had set up. The border location was a 12-hour round trip from father's home in Mexicali, he did not have transportation, and could not miss an entire day of work.

J.Y. testified that when the twins were first placed with him they were "very fearful" and "extremely immature for their age." The twins' teacher and principal approached him with concerns that they were behind in school, and the foster parents provided one-on-one tutoring for the twins. By the time of the hearing, the twins were happy, confident, and educationally and emotionally on target. They loved to read and play soccer with J.M. J.Y. testified that the twins had developed a close bond with J.M. and that they looked up to him and spent a lot of time playing with him.

J.Y. also testified that he used to have a good relationship with mother, until recently, when she "changed 100% what she told [him]" about father, which made him "fearful and concerned about where she is coming from." He said that mother told him and J.M. during the foster family's first visit with the twins that she had "traded" M.M.,

10

for the twins. She also told him that when she had arrived in Mexico to live with father, the twins were "filthy" and did not have shoes. She said that father had not been feeding the twins properly and would leave them with strangers. During her testimony, mother denied having told the foster parents anything negative about father.

J.Y. did not think that the boys had many memories of the time they lived with father in Mexico. When he asked them if they remembered Mexico, "they started mentioning things that didn't make sense." For example, they said that in Mexico they would go to "Elmer's," which, as J.Y. explained, was a place in California where he would take the twins.

J.Y. testified that although he spoke "[v]ery little" Spanish, he initially tried speaking it with the twins, while also teaching them English. Ultimately, he stopped speaking Spanish with the twins, which was an unconscious decision on his part. He also attempted to call father during the beginning of the twins' placement. Father's line had no option for leaving a voice message. J.Y. was able to reach father on a few occasions, but mother would report back to J.Y. that father had been unable to understand him. Father had J.Y.'s cell phone number, but father called J.Y. only once during the past year, right after the original 12-month hearing. During the year the twins had been in his care, he estimated they spoke with father six times. The twins would "become very frustrated" during these calls because they could not speak Spanish.

During the social worker's testimony, the juvenile court questioned him about his attempts to arrange phone and in-person visits with father. After a short time, it became apparent to the court that DPSS had not put forth sufficient effort to contact father, and

11

the court stated that it was clear that DPSS had failed to provide reasonable services to father.

The court then asked the social worker whether there would be a detriment to the twins if they returned to father in Mexico. The social worker provided two reasons why he believed returning the twins would create a substantial risk of detriment. First, because the twins no longer spoke Spanish, they would not be able to communicate a medical need if one were to arise when they were in father's custody. Second, because there had been no visits, he had not been able to assess the relationship between father and the twins. He did not know how father would interact with the twins or whether the twins would suffer any emotional impacts when visiting with father. For example, he was concerned that the twins would suffer emotional harm if they were returned to father's custody because they had expressed that they did not want to live with father and wanted to be adopted by their foster parents.

After testimony and counsel's oral argument, the juvenile court ordered that the twins remain in foster placement on the ground that returning them to father's custody would create a substantial risk of harm to their emotional well-being. The court based its detriment finding on the following grounds: (1) the twins are young and have not seen father for two years; (2) they do not speak the same language as father; (3) they have been living in a different culture; and (4) they are bonded to their half-brother.

The juvenile court found that father had made satisfactory progress in his case plan, and that there was a substantial probability the twins would be returned to him within six months. However, the court also found that DPSS had failed to provide

reasonable reunification services to father and to comply with the case plan to return the children to his custody. As a result, it provided father with six more months of reunification services.

The court stated, "The issue for me is the department has screwed up. The remedy for that is not to punish the kids in some way. And I think that [at] this point today these kids are not ready to go to father in Mexico. I'll say because of the department's screw-ups." The court expressed its frustration with the amount of time DPSS's had spent on contacting father and told DPSS that it expected to "see more effort [by] the department to set [visits] up." The court ordered DPSS to arrange weekly contact between the twins and father by telephone or Skype, and to be more active in contacting Mexican officials to arrange in-person visits.

ANALYSIS

1.      *Mother has standing on appeal*

As an initial matter, we reject DPSS's argument that mother lacks standing on appeal because she had been denied reunification services, was no longer in a relationship with father, and had remarried. In general, a parent's standing to appeal a judgment in a dependency matter is construed liberally. (*In re H.G.* (2006) 146 Cal.App.4th 1, 9.) Where parental rights have not yet been terminated, the parent retains a fundamental interest in a dependent child's companionship, custody, management, and care. (*Ibid.*) Here, mother's parental rights have not been terminated, and her interest in reversing the court's order is to retain those rights.

13

2.    *The court's detriment finding is supported by substantial evidence*

Father and mother argue that insufficient evidence supports the juvenile court's finding that returning the twins to father's custody would create a substantial risk of detriment to their emotional well-being under section 366.21, subdivision (f).  We disagree.

"At a status review hearing, the court must return the child to the physical custody of his or her parent unless the Agency proves, by a preponderance of the evidence, that return to the parent would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1423-1424, citing § 366.21, subd. (f).)  The goal of the reunification period is to "preserve the family whenever possible."  (*Tracy J.*, at p. 1423.)  However, a parent's interest in the care and custody of a child cannot be maintained at the expense of the child's well-being.  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.)

"[T]he question whether to return a dependent child to parental custody is not governed solely by whether the parent has corrected the problem that required court intervention; rather, the court must consider the effect such return would have on the child."  (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901.)  If returning the child will create a substantial risk of detriment to his or her physical or emotional well-being, "placement must continue regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody [under section 300]."  (*Id.* at p. 900.)

We review a court's detriment finding for substantial evidence. (*Tracy J. v. Superior Court*, *supra*, 202 Cal.App.4th at p. 1424.) Substantial evidence is "credible evidence of solid value such that a reasonable trier of fact could make the findings challenged." (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.) On review, we do not reweigh the evidence or determine the credibility of witnesses, but view the entire record in the light most favorable to the judgment, accepting favorable evidence as true and rejecting unfavorable evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

In this case, the twins have not seen father in two years and no longer speak the same language as he does. The sheer fact that the twins can no longer communicate with father poses significant issues for the twins' physical and emotional well-being, the most pressing of which is the risk that father would be unable to provide for the twins in the event of an emergency. Additionally, the record indicates that when the twins were removed from mother's bilingual home and placed in an English-only foster home, they were behind emotional and developmental targets. During the year they lived with their current foster parents, the twins adjusted to their new home, became fluent in English, and made educational and emotional improvements. The juvenile court could reasonably find that another abrupt communication change—this time placement in a home where the twins would be unable to communicate with father until they relearned Spanish or father learned English—was likely to be emotionally detrimental to the twins.

Furthermore, because there have been no in-person visits and only a handful of brief phone conversations, it was impossible for the juvenile court to assess the relationship between father and the twins. Visitation is a key aspect of the reunification

15

stage because it informs the court about the existence and extent of the parent-child bond and whether the parent can appropriately care for his or her child. (*In re Julie M.*, *supra*, 69 Cal.App.4th at p. 49 ["An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children 'as frequent[ly] as possible, consistent with the well-being of the minor' "].) Here, visitation is especially vital to assess the parent-child relationship because the twins do not wish to live with father, and the last time they lived with him they saw him hit mother on multiple occasions.

The court's detriment finding is not based on father's lack of progress or participation in reunification services. In fact, the court found that father had made satisfactory progress. Father had completed his parenting program, been psychologically assessed and cleared, and was living in an appropriate home to care for small children. Rather, the court's finding is based on how placement will affect the twins, an assessment it is required to make. (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 901 ["the court must consider the effect . . . return would have on the child"].) While DPSS, not father, is to blame for the lack of visitation,[4] the fact remains that the twins had not seen father for two years and, as a result, the court had no evidence before it to indicate the nature of father's relationship with the twins. On the other hand, the evidence DPSS presented to the court constitutes substantial evidence that an abrupt change of custody would create a significant risk of emotional harm to the twins.

---

[4] DPSS concedes it failed to provide reasonable reunification services.

16

Father argues that an imperfect bond between a parent and child is not a sufficient ground for finding detriment, and he cites to several cases for support. However, all of the cases he cites are inapplicable because in each case there were at least some visits with the parent and, thus, the court had evidence of the parent-child relationship when making its detriment finding. (See *In re David B.* (2004) 123 Cal.App.4th 768, 773, 777-778; *In re E.D.* (2013) 217 Cal.App.4th 960, 966; *In re Z.K.* (2011) 201 Cal.App.4th 51, 59; *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1258-1259.) For example, in *In re E.D.,* the child had had "visited extensively with father," had attended counseling and therapy sessions with him, and "was eager to live with [him] permanently." (*E.D.*, at p. 966.) Similarly, in *In re David B.*, the father had attended 18 months of steady supervised visitation and the agency found that his parenting skills improved over the course of those visits. (*David B.*, at pp. 773, 777-778.) Here, on the other hand, the twins have not had a single in-person visitation with father in the past two years, and thus there is no evidence of the parent-child bond, imperfect or otherwise.

The single case father cites that involved no visits between the father and son, *In re John M.* (2006) 141 Cal.App.4th 1564, is inapplicable because the father was a nonoffending parent and because it involved an earlier stage of dependency (initial placement after a finding of jurisdiction). (*Id.* at pp. 1567-1568.) As the California Supreme Court has recognized, "[i]n *any* custody determination, . . . '[w]hen custody continues over a significant period, the child's need for continuity and stability,' " as compared to a parent's interest in caring for his or her child, " 'assumes an increasingly important role.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317, italics added.)

Moreover, despite father's contentions, the fact the lack of visits was DPSS's fault is irrelevant to the detriment analysis. The statutorily required remedy for an agency's failure to provide reasonable services is the provision of more services rather than return of the child to parental custody. (§ 366.21, subd. (g)(1) [if reasonable services have not been provided to the parent the court must continue the case for up to six months].)

Father also argues that the court's finding was in error because returning the twins to his custody would not create a substantial risk of emotional harm. He points out that the twins are already familiar with him and the culture in Mexicali because they had lived with him for over three years before mother took them back to California. He also argues that the twins can learn Spanish the same way they recently learned English. These arguments ignore our task in a substantial evidence review, which is to draw all inferences in support of the finding, not look for reasons why the finding should not stand. Here, substantial evidence of a substantial risk of detriment exists in the record—namely, the twins cannot currently speak Spanish, have not seen father in two years, do not remember much of living with him in Mexico, and saw him abuse mother. We must review the record in the light most favorable to the court's finding. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735.)

Next, both father and mother take issue with various aspects of the court's detriment analysis. First, they argue that the court improperly considered the twins' bond with their half-brother, J.M. Mother incorrectly contends that the court could not consider the twins' relationship with J.M. because he was not a dependent of the court.

18

While section 366, subdivision (a), requires a court to consider a child's relationship with any siblings who are also dependents of the court, nothing in the dependency statutes or case law prohibits a court from considering a child's relationship with any nondependent siblings. Rather, "a court is authorized to evaluate the appropriateness of keeping siblings together, and to consider sibling relationships as one factor, among many, when determining detriment for purposes of its placement decisions." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422.) Father incorrectly contends that a court cannot consider a sibling bond unless that bond is " 'much closer than in normal sibling relationships' " in that it helps the siblings to " 'survive.' " The case father cites as support sets forth no such rule; rather, it held that the bond between the dependents and their half-siblings was so unusually strong that it *alone* supported the detriment finding. (*Id.* at pp. 1426-1428.) Here, the bond between the twins and their half-brother was one of several factors supporting the court's detriment finding.

Second, parents argue that the court improperly considered the twins' relationship with their foster parents and their desire to be adopted. However, the record demonstrates that the court explicitly refused to consider the twins' desire to remain in their foster home as a basis for finding detriment. When mother's counsel raised the issue of the children's desire to be adopted as an inappropriate basis to find detriment, the court responded, "I'm not putting much stock [i]n that."

Third, parents argue that the court failed to consider the extent of father's participation in reunification services. In fact, the opposite is true. In chiding DPSS for failing to provide reasonable services, the court explicitly found that father had been

19

making satisfactory progress in his reunification plan. Moreover, a parent's full compliance with the case plan is just one fact among many for the court to consider at a postdispositional review hearing. Compliance does not create a presumption that the child should be returned to parental custody. (See, e.g., *Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1020-1021 [despite finding that father complied with the case plan, juvenile court properly terminated reunification services].)

Lastly, mother argues that the court also failed to consider the barriers to visitation father faced as a deportee, as section 366.21, subdivision (f), requires. While section 366.21 does require the court to consider the fact that father is a deportee, this consideration pertains to the issue of father's case plan compliance, not to the issue of detriment. (See § 366.21, subd. (f) [in determining whether a parent "participate[d] regularly and ma[d]e substantive progress in court-ordered treatment programs . . . the court shall consider . . . deported parent's . . . access to those court-mandated services"].)

### DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.

20